IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

  Vs.                      No.  07-40002-01/02-SAC

ROBERT L. JONES, and
CRYSTAL L. BLANCHARD,

        Defendants.

MEMORANDUM AND ORDER

The case comes before the court on the defendant Crystal Blanchard's pretrial motion to suppress evidence seized from a car she was driving on January 5, 2007, (Dk. 27) and the defendant Robert Jones's motion to join the co-defendant's motion to suppress (Dk. 28).  The government has filed a response opposing the motion to suppress. (Dk. 29).  The parties presented evidence and oral argument in support of their positions on June 21, 2007.  Having reviewed all matters submitted and having researched the relevant law, the court is ready to rule on the motions.

**INDICTMENT**

The defendants, Robert L. Jones and Crystal L. Blanchard, are

charged in a single count indictment with violating 21 U.S.C. § 841(a)(1) on January 5, 2007, in the District of Kansas, by possessing with the intent to distribute approximately 4 kilograms of cocaine.

**FACTS**

On January 5, 2007, Kansas Highway Patrol Trooper Chris Nicholas came on duty at 6:00 a.m. and began patrolling I-70 in Wabaunsee County.  Less than an hour after coming on duty, he observed a dark-colored Chevrolet Impala traveling eastbound in the right lane and began following it.  As he came up behind it in his marked patrol car, Trooper Nicholas observed the Impala run out of its lane and cross over the fog line or the solid white line marking the right boundary of the lane. The car crossed over the fog line by at least the width of a tire and then returned to the right lane.  Just before exit 330, Trooper Nicholas put on his emergency lights and pulled over the Impala for crossing over the fog line.

Trooper Nicholas testified he was suspicious the driver was drowsy or sleepy based upon the swerve in combination with several other circumstances.  First, there was nothing about the conditions of the road, traffic, or weather to explain the sudden movement.  He saw nothing in the road to justify the sudden swerve, and the wind was light.  The road was

2

straight, and no traffic was seen in the immediate vicinity.  Second, because the car had a Minnesota license plate and its exterior showed signs of having been driven recently in weather not currently experienced in Kansas, he believed there was a likelihood the car was being driven a long distance on a trip that went through Kansas.  Third, it was approximately 6:55 a.m. and still dark outside.  Fourth, based upon personal experience, he testified to some particular difficulty staying awake just before dawn when working an overnight shift.  Fifth, he believed he had followed the Impala for less than five miles when it swerved onto the shoulder.  Sixth, he testified to having worked accidents, a significant percentage of which were caused by the driver falling asleep.  Trooper Nicholas did not observe any stopped cars or debris on the shoulder where the defendants' car had swerved.  He also did not see any other instances of the defendants' car weaving within its lane of traffic.

Trooper Nicholas' patrol vehicle is equipped with a video camera which began recording the stop as the defendants' car was pulling over.  The video recording admitted into evidence shows the defendants' car pulling onto the shoulder and its rear lamp signaling a right lane change.  The car stops on the shoulder of the exit ramp.  As it is dark,

3

Trooper Nicholas is using his flashlight when he approaches the driver's side.  He asks for the driver's license and paperwork.  He then explains that while coming up from behind he observed the car drive off the edge of the road and asks the driver, who is later identified as Crystal Blanchard, if she's been driving for some time.  The driver replied affirmatively saying they were coming from Minnesota.

Trooper Nicholas requests the passenger's license or identification and inquires if the car is a rental vehicle.  Learning that it has been rented, Nicholas requests the rental papers and asks the passenger, who is later identified as Robert Jones, if he rented car.  Jones replies that his name should appear on the rental papers.  Trooper Nicholas then informs the driver that he's not going to write her a ticket but directs her to join him in the patrol car, which she does.

While taking her seat in the patrol car, Ms. Blanchard volunteers that she's been driving for awhile.  In response to a series of questions from Trooper Nicholas, Ms. Blanchard discloses that the passenger is her boyfriend and they are going home to Minnesota from a two-day vacation in Las Vegas, Nevada, and are returning early as her mother is keeping her son and had telephoned that her son was ill.  Ms.

4

Blanchard identifies the lessee on the rental car agreement as a cousin of her boyfriend.  Trooper Nicholas thanks the driver and asks her to have her boyfriend join him in the patrol car.  In the meantime, Trooper Nicholas radios dispatch with license and identification numbers.

Trooper Nicholas repeats his series of questions and receives similar answers from the passenger Jones.  Jones says his cousin rented the car, as he did not have a credit card to secure it.  Jones also explains his dry coughs to having been asleep when the trooper pulled them over. Trooper Nicholas instructs Jones to return to the car and notes the stop will be completed in a couple of minutes.

Based on his recorded conversations with another trooper and dispatch, Trooper Nicholas apparently knew that the rental car was due back in Minnesota on January 7th, that both defendants' drivers' licenses were suspended, and that neither of the defendants' names appeared on the rental agreement.  During the stop, Trooper Nicholas turns off his microphone as he asks for social security numbers in response to dispatch's request for more identifying information on the defendants.

At approximately 7:13 a.m., Trooper Nicholas returns the paperwork to the defendant and passenger, informs them that their

5

licenses are suspended, and gives them only a warning.  He tells them to have a safe trip and takes two steps away from the car.  He then steps back toward the driver's window and obtains permission to ask more questions.  He asks why their names don't appear on the rental agreement, and the passenger Jones repeats that his name should be on it.  Trooper Nicholas inquires next whether they have anything illegal in the car, like drugs or guns.  Receiving a negative response, he follows up by asking for permission to search the car, and the passenger Jones answers, "sure."

Trooper Nicholas instructs Blanchard and Jones to exit and stand in front of their car and near the ditch.  Trooper Nicholas uses the keys from the ignition to unlock the trunk and finds inside it numerous bags and what appears to be a gift box wrapped in silver paper.  He observes that the box is not wrapped carefully and that wider packaging tape had been used.   Less than a minute after commencing his search, Trooper Nicholas directs the backup officer, Trooper Leatherman, to ask the defendants about the contents of the wrapped package.  Trooper Leatherman does so and reports back that they said it is a toy from a souvenir shop and that they would not be more specific.

Believing a gift shop would have exercised more care in

6

wrapping the package and would have used a different kind of tape,

Trooper Nicholas opens one end of the wrapped package by carefully

pulling apart the taped edges and then shines his light inside the package.

Seeing that the box inside originally held a car stereo speaker which is not

merchandise typically sold by a gift shop, Nicholas instructs Leatherman to

ask again about the package's contents.  While Leatherman is away,

Nicholas continues separating the wrapping paper from the tape to provide

better access to one end.  Nicholas accomplishes this without tearing the

wrapping paper.  Leatherman returns with the defendants' story that it is a

3D puzzle of the city of Las Vegas and a pair of shoes in a larger box that

he asked the mall salesperson to find for his gifts.  What Trooper Nicholas

feels on the outside of the box and what he hears when he shakes the

package does not match the defendant's story.  Trooper Nicholas then

pries open the end of the box and reaches inside while Trooper

Leatherman also pulls back on the paper and box.  With his hand inside

feeling the contents, Trooper Nicholas infers the package contains illegal

narcotics based on its plastic wrapping, size, and hardness.  The

defendants are placed under arrest, and the box is opened to find four

kilograms of cocaine powder.

**ISSUES**

The defendant Blanchard's motion raises two challenges to the search of the car.  First, did Trooper Nicholas have reasonable suspicion to make the initial traffic stop?  The defendants contend that Trooper Nicholas did not have reasonable suspicion that the defendant Blanchard in crossing over the fog line once violated K.S.A. § 8-1522, as that statute has been recently interpreted and applied by the Kansas Court of Appeals.  The defendants' second challenge is whether Trooper Nicholas exceeded the scope of the consensual search in unwrapping the package found in the trunk?  The defendants analogize the wrapped package to a locked container for which officers must seek specific permission to open and they may not rely on the general consent to search.

**RELEVANT LAW AND ANALYSIS**

<u>Initial Stop</u>

A traffic stop is a seizure under the Fourth Amendment.  *United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003).  Routine traffic stops are analyzed under the same investigation detention principles set out in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).  The reasonableness of a traffic stop is

determined from the dual inquiry whether "the officer's action was justified at its inception," and whether the officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Ledesma*, 447 F.3d 1307, 1312 (10th Cir. 2006) (quotations and citations omitted).

"An initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d at 1348 (citation omitted). Put another way, a court must determine "whether the particular officer had reasonable suspicion that the particular motorist violated 'any of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *United States v. Hunnicutt*, 135 F.3d at 1348 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). For there to be reasonable suspicion of wrongdoing, the facts known to the officer must have provided him with "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (quotations and citations omitted); *see United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006). "The evaluation is made

9

from the perspective of the reasonable officer, not the reasonable person."
*Quintana-Garcia*, 343 F.3d at 1270 (italics omitted).  A reasonable
suspicion is "more than an inchoate and unparticularized suspicion or
hunch," is "considerably less than . . . a preponderance of evidence," and is
"only a minimal level of objective justification."  *Edgerton*, 438 F.3d at 1047
(quotation and citation omitted).

Trooper Nicholas conducted the traffic stop after observing the
Impala weave out of its lane of traffic and cross over the fog line by at least
the width of a tire.  Besides believing this was a lane violation of K.S.A. § 8-
1522(a), Trooper Nicholas was concerned that the driver could be sleepy
or drowsy as evidenced by the swerve onto the shoulder and other
circumstances.[1]  The court will consider both grounds in deciding whether
Trooper Nicholas has reasonable suspicion to stop the defendants' car.

The defendants maintain the single swerve onto the shoulder
does not violate K.S.A. § 8-1522(a), which states:  "A vehicle shall be

---

[1]As discussed earlier, these circumstances include the absence of
road, traffic or weather conditions to explain the sudden movement and the
presence of other factors making it more probable that the driver could be
sleepy.  These other factors include the early morning hour and a car
apparently being driven on an extended trip as evidenced by the Minnesota
license plate and by the effects of recent weather appearing on the car's
exterior.

10

driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  The defendants argue that the Kansas Court of Appeals in *State v. Ross*, 37 Kan. App. 2d 126, 149 P.3d 876 (2007), "changed the legal landscape for analysis of K.S.A. 8-1522 violations."  (Dk. 27, p. 6).  Disagreeing with the defendant's reading of *Ross*, the government offers that the reasonable suspicion inquiry on a § 8-1522 violation has always been fact-driven and that unlike the situation in in *Ross* Trooper Nicholas here was concerned the driver was sleepy or drowsy.

<u>State v. Ross</u>

After following the defendant's car for approximately two miles on a section of interstate highway, the officer saw the car cross over the fog line once and pulled it over as a result.  The officer explained to the driver that the stop was occurring because the car had crossed the fog line. The officer also told the driver that this was not "any real big deal" as the car had crossed the line only "a little" and that no ticket would be issued as "it was a little windy."  37 Kan. App. 2d at 127.

In reversing the district court's finding of reasonable suspicion

11

to conduct a traffic stop, the appellate panel construes "as nearly as practicable" in K.S.A. § 8-1522(a) in these terms:

> Ross argues that because the statute only requires a driver to maintain a single lane "as nearly as practicable," his failure to maintain a single lane does not necessarily constitute a violation of K.S.A. 8-1522(a). We agree. "As nearly as practicable" connotes something less than the absolute. Automobiles are not railway locomotives. They do not run on fixed rails. Obviously, K.S.A. 8-1522(a) does not prohibit a vehicle from changing lanes. A driver is permitted to exercise, rather is *required* to exercise, discretion in deciding when and whether to change lanes. We need not drive through a pothole in the road and damage our vehicle in the process when we may safely avoid it by changing lanes or moving partially onto the shoulder of the roadway. K.S.A. 8-1517 permits us to leave our regular lane of travel to pass a slower moving vehicle when we overtake it. A stalled automobile or a fallen tree limb in the roadway ahead does not require us to wait for its removal. We drive around it. In doing so, the essential gravamen of K.S.A. 8-1522(a) comes into play. We may move from our lane of travel only after first determining it is safe to do so.

37 Kan. App. 2d at 129-30 (italics in original). Succinctly put, "as nearly as practicable" accommodates circumstances that justify lane changes, such as an obstruction in the lane, and consequently permits a driver in the exercise of his or her discretion to change lanes but only after first determining it is safe to change.

Working from this construction of the statute, the court of appeals next considers what circumstances are necessary to sustain a reasonable suspicion that § 1522(a) has been violated:

> In the context of an alleged violation of K.S.A. 8-1522, this requires more than a showing by the State that a defendant moved from the regular lane of travel, since it is not illegal to change lanes when it is not done in violation of some other statute and it is safe to do so. Thus, in articulating reasonable suspicion that a traffic offense has occurred in order to justify the traffic stop, the totality of the circumstances must make it appear to the officer that not only did the defendant's vehicle move from its lane of travel, but it *left its lane when it was not safe to do so*.

37 Kan. App. 2d at 130 (italics added).  The opinion cites no legislative history nor case law in support of this interpretation which ostensibly would require a stopping officer to have reasonable suspicion in every instance that the lane departure was actually unsafe.

With these legal propositions in hand, the appellate panel applies them to the traffic stop in question:

> In the present case, Ross was proceeding northbound on I-135 near Newton.  We presume that the right shoulder of the highway was paved, as is the normal situation, since there is no evidence to the contrary.  There was no testimony that there was any obstacle or barrier on the shoulder that presented an immediate danger.  There was no testimony that sand, gravel, or debris on the shoulder presented a hazard to a motorist who directed his or her vehicle onto the shoulder.  There was no testimony that Huntley was concerned that the driver might have been falling asleep or was intoxicated. Ross' vehicle was not weaving back and forth on the roadway.  He was not using the paved shoulder as a regular lane of travel.  He crossed the fog line only briefly, for only a short distance, and only once.  In short, there was no reasonable suspicion that Ross was engaged in the conduct that is at the heart of the statute:  moving a vehicle from its lane of travel without first ascertaining that it could be done safely.  Absent any such concern on Huntley's part, there was

no reasonable suspicion to warrant stopping Ross . . . .

37 Kan. App. 2d at 131.  Noteworthy in this quotation and the court's application is that the court articulates reasonable suspicion as a lane departure made "without first ascertaining" the safety of the change rather than a lane departure made when it was actually not safe to do so.

<u>Precedential Weight of Ross</u>

At the hearing, the defendants argued the *Ross* decision stands as the first Kansas appellate court to have interpreted K.S.A. § 8-1522(a). This overstates the actual context of *Ross*, for in earlier decisions, both the Kansas Court of Appeals and the Kansas Supreme Court have considered and discussed whether a vehicle was operated in violation of this statute or whether an officer had reasonable suspicion that this statute was violated. *See, e.g.*, *State v. Vistuba*, 251 Kan. 821, 822-23, 840 P.2d 511 (1992) (deputy observed a violation of § 1522 when the pickup left the roadway onto the dirt shoulder and was returned to the roadway at least twice); *State v. Maberry*, 138 P.3d 798, 2006 WL 2129206 (Kan. App. Jul. 28, 2006) (unpub.) (reasonable suspicion of a § 1522 violation existed when tires crossed the fog line twice and by at least three feet on the second

14

crossing);[2] *State v. Bryant*, 81 P.3d 1276, 2004 WL 48874 (Kan. App. Jan.

9, 2004) (reasonable suspicion of a § 1522 violation when tires crossed

center line by one foot and then immediately crossed the fog line by one

foot).[3]  In fairness to the defendants, their advocacy of *Ross* is not beyond

the impression created by its limited citations and minimal discussion of

other precedent.[4]  The defendants' reliance on *Ross* here squarely raises

_____

[2]In *Maberry*, the appellate panel considered whether there was
reasonable suspicion that the defendant violated § 1522, which "requires
that '[a] vehicle shall be driven as nearly as practicable entirely within a
single lane.'"  The panel contrasted and compared decisions by the Tenth
Circuit and Kansas federal district courts that had applied this statute and
then concluded:

> "The facts in this case are very similar to those in [*United States v.*]
> *Ozbirn*, [189 F.3d 1194 (10th Cir. 1999)].  Here, Estrada's car drifted
> over the fog line twice in a 1-mile stretch, one time by about 3 feet.
> There was no bad weather, wind, or other road condition to explain
> why the car crossed the fog line.  Under the specific facts and
> circumstances of this case, there was a traffic violation sufficient to
> support a legal stop.

2006 WL 2129206 at *4.  There is no discussion as to whether the officer
had reasonable suspicion that the lane crossings were made without first
determining the safety of them.

[3]In light of *Ross*, the court does not cite *Maberry* or *Bryant* as
persuasive authority on the interpretation of § 1522(a), but they serve to
illustrate that the *Ross* opinion was not written on a clean slate concerning
Kansas appellate court opinions.

[4]For that matter, the Tenth Circuit in 1999 observed that "the Kansas
state court decisions referencing this statute [K.S.A. § 8-1522] do not
specifically address what constitutes a violation."  *United States v. Ozbirn*,
189 F.3d 1194, 1198 (10th Cir. 1999).

for this court's consideration the issues of what *Ross* precisely held and what precedential weight should be afforded that decision.

It cannot be overlooked that any assessment of a precedent's weight, particularly a decision by an intermediate appellate court, will necessarily include some evaluation of the decision's merits. Of course, this cannot be done without first understanding the parameters of the holding in question. One can readily appreciate that *Ross* interprets K.S.A. § 8-1522(a) in a way that collapses the express duty to drive "as nearly as practicable in a single lane" into the equally express duty to move from a lane only after "the driver has first ascertained that such movement can be made with safety."[5] The result is now a single duty, that is, "the essential gravamen of" § 1522(a), "[w]e may move from our lane of travel only after first determining it is safe to do so." 37 Kan. App. 2d at 130.

Other language in *Ross* demands even more critical consideration:

---

[5]In so doing, the first duty appears to be of no consequence in the enforcement of the statute and the language describing this duty is rendered superfluous. For under this construction, would it be unlawful for a vehicle to travel between two lanes or to switch lanes repeatedly and needlessly so long as the driver first determined it was safe to do so under the circumstances? In short, does not this construction impair the apparent statutory purpose of promoting the integrity of lane markers?

16

In the context of an alleged violation of K.S.A. 8-1522, this requires more than a showing by the State that a defendant moved from the regular lane of travel, since it is not illegal to change lanes when it is not done in violation of some other statute and it is safe to do so. Thus, in articulating reasonable suspicion that a traffic offense has occurred in order to justify the traffic stop, the totality of the circumstances must make it appear to the officer that not only did the defendant's vehicle move from its lane of travel, but it left its lane when it was not safe to do so.

37 Kan. App. 2d at 130.  This quoted language is the most problematic in

*Ross*.  If intended to be a statutory interpretation,[6] then a person does not

violate § 8-1522(a) unless the lane movement violates some other statute[7]

---

[6]Such an interpretation does not appear consistent with the plain terms of § 8-1522(a).  As written, the statute plainly recognizes a violation when the lane movement occurs without the operator first ascertaining the safety of the movement.  It does not provide that a violation occurs only when the lane change is actually unsafe.  Such an interpretation effectively changes the criminal act from the failure to determine the safety of a lane movement to the lane movement being unsafe when done.  While one reasonably could argue that any lane movement made without first determining its safety is unsafe when done, the decision in *Ross* does not appear to adopt such a position.

[7]This mention of other statutes could be interpreted as a mere reference to the earlier cited statute that provides for passing slower traffic. This comment also may be an effort to summarize comprehensively when lane movements are illegal in Kansas.  In that regard, driving on the shoulder of a divided highway appears to implicate several other statutes in Kansas.  Specifically, K.S.A. § 8-1524 provides that "[n]o person shall . . . (e) drive any vehicle on a divided highway except on the proper roadway provided for that purpose and in the proper direction and to the right of the intervening space, physical barrier or a clearly indicated dividing section so constructed as to impede vehicular traffic between roadways unless directed or permitted to use another roadway by official traffic-control

or occurs when it is actually unsafe to do so.  *See United States v. Lopez*,

485 F. Supp. 2d 1226 (D. Kan. 2007).[8] The context in *Ross* for this

discussion remains what facts are necessary for reasonable suspicion of a

---

devices or police officers."  *See State v. Anderson*, 134 Idaho 552, 6 P.3d 408, 410-11 (Idaho App. 2000).  Another provision is that a "driver of a vehicle may overtake and pass another vehicle upon the right only under conditions permitting such movement in safety.  Such movement shall not be made by driving off the roadway."  K.S.A. 8-1517(b).  Kansas law defines, "roadway" to mean "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the berm or shoulder." K.S.A. 8-1459.

[8]In *Lopez*, the district court latches onto this controversial language in *Ross* making it the standard by which to evaluate whether § 8-1522 was violated:

"The appropriate standard when evaluating a violation of K.S.A. § 8-1522, therefore, is whether the vehicle crossed the fog line when it was not safe to do so.  Based on this standard, the facts in this case do not support a reasonable suspicion that Mr. Lopez violated K.S.A. 8-1522.  There is no indication in the record that Mr. Lopez crossed over the fog line when it was unsafe to do so.  Trooper Lovewell specifically testified that there were no other cars around and there was nothing on the shoulder that Mr. Lopez could have hit or endangered by briefly crossing over the fog line.

Here, Trooper Lovewell was mistaken in his belief that a violation of § 8-1522 occurs when a vehicle crosses the fog line once with no other explanation for such movement; rather, such a violation occurs when a vehicle crosses the fog line when it is not safe to do so."

485 F. Supp. 2d at 1232.  In a footnote to this passage, the district court observed that it "must look to the Kansas court's interpretation of the" statute and that it did not need to consider how Kansas appellate courts would interpret this statute as *Ross* had done so.  *Id.* at n. 13.  This court does not share this broad reading of the holding in *Ross* or the precedential weight so afforded it in *Lopez*.

K.S.A. § 8-1522(a) violation.  While this language from *Ross* may appear to redefine the offense as involving an actual unsafe lane movement, the opinion later concludes its analysis of the facts in this way:  "In short, there was no reasonable suspicion that Ross was engaged in the conduct that is at the heart of the statute:  moving a vehicle from its lane of travel **without first ascertaining that it could be done safely**."  37 Kan. App. 2d at 131 (emphasis added).  In this court's judgment, the *Ross* opinion is ambiguous on whether an officer has reasonable suspicion of a K.S.A. 8-1522 violation only if the lane movement was actually unsafe or whether it is enough that the officer reasonably suspects the driver failed to determine first the safety of the lane movement.[9]

        Published decisions of the Kansas Court of Appeals, like *Ross*, have precedential value in deciding what Kansas law is and how to apply it, and may "'not . . . be disregarded by a federal court unless it is convinced

_____

[9]The court is not inclined to follow *Lopez* in its understanding of this problematic language in *Ross*.  First, the court in *Ross* does not later restate this troubling interpretation as part of its conclusion.  Second, the controversial interpretation can be fairly read instead as an officer will have reasonable suspicion that a lane movement was made without first determining the safety of the movement if the movement was actually unsafe to make.  Third, as will be discussed in more detail later, the Tenth Circuit in *United States v. Brown*, 2007 WL 1241646 (10th Cir. 2007), an opinion issued on the same day as *Lopez*, cited *Ross* but did not interpret this problematic language in the same way.

by other persuasive data that the highest court of the state would decide otherwise." *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1000-1001 (10th Cir. 2002) (quoting *West v. A.T. & T.*, 311 U.S. 223, 236-37 (1940)).  Consequently, this court should consider *Ross* as the proper interpretation of § 8-1522(a) unless persuaded that the Kansas Supreme Court would interpret it differently.  After taking a closer look at the relevant body of case law on this issue, the court is convinced that the Kansas Supreme Court would not interpret § 8-1522(a) as to require for reasonable suspicion of any violation of this statute that the vehicle moved from the lane of travel when it was not safe to do so.

The *Ross* opinion does not discuss that K.S.A. § 8-1522 was patterned after § 11-309 of the Uniform Vehicle Code.[10]  *See* K.S.A. 8-2204.  This fact influences the interpretation of § 8-1522, for the Kansas Legislature has directed that the uniform act "shall be so interpreted and

_____

[10]As quoted in *State v. Phillips*, 2006 WL 3477003, at *8 n.9 (Ohio Ct. App. 3 Dist 2006),  Uniform Vehicle Code § 11-309(a) (2000) states: Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply. (a) A vehicle shall be driven, as nearly as practicable, entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

construed as to effectuate its general purpose to make uniform the law of those states which enact it."  K.S.A. § 8-2203.   To satisfy this legislative mandate, a court interpreting § 8-1522(a) or another statute based on the Uniform Vehicle Code would need to consider how other jurisdictions have construed their similar statutes.  *See, e.g.*, *State v. Budden*, 226 Kan. 150, 152-53, 595 P.2d 1138 (1979); *Every v. Jefferson Ins. Co. of New York*, 4 Kan. App. 2d 715, 719-20, 610 P.2d 645 (1980).  "The Uniform Vehicle code was designed and advanced as a comprehensive guide or standard for state motor vehicle laws."  *State v. Moore*, 237 Kan. 523, 525, 701 P.2d 684 (1985).

The *Ross* opinion devotes almost no attention to whether its construction of § 1522(a) conforms with the interpretations reached in other jurisdictions.[11]  It cites just two decisions, both from the Tenth Circuit, one involving the application of K.S.A. § 8-1522(a) and the other involving the statutory counterpart in Utah.  Its discussion of this Tenth Circuit precedent does not reveal much about the rationale behind its interpretation of § 1522(a).

---

[11]The opinion in *Ross* identifies no reason, precedent, policy or other circumstance unique to Kansas as a basis for its interpretation of K.S.A. § 8-1522(a).

While recognizing that *United States v. Cline*, 349 F.3d 1276 (10th Cir. 2003), "dealt with the legality of a traffic stop for crossing the fog line in violation of the same [Kansas] statute," the *Ross* court said that its "case stands in interesting contrast" to *Cline*.  37 Kan. App. 2d at 130. *Ross* does not describe what about *Cline* makes it an "interesting contrast"[12] or even offer whether the contrast is based on law or fact.  The *Ross* opinion does not discuss how the *Cline* decision reflects the Tenth Circuit's considerable body of case law that has consistently interpreted and applied K.S.A. § 8-1522(a) as well as similar statutes of other states within this circuit.  In *Cline*, the Tenth Circuit relied on *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999), and rejected the defendant's argument that swerving off the road just once could never be a violation of K.S.A. § 8-1522 because of the holdings in *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996), and *United States v. Ochoa*, 4 F. Supp. 2d 1007 (D. Kan. 1998):

---

[12]Of course, "interesting contrast" simply may be a discreet expression of disagreement.  For in *Cline*, the court focused on whether the officer had reasonable suspicion that the defendant in crossing the fog line only once had not driven the vehicle "as nearly as practicable within a single lane."  349 F.3d at 1286.  The *Cline* opinion does not quote nor discuss the other duty in § 8-1522(a), that is, whether the officer had reasonable suspicion that the defendant had failed to determine first whether it was safe for him to swerve off the road.

Thus, in *Gregory*, the defendant was driving a U-haul on a mountainous, winding road, in windy conditions.  79 F.3d at 975.  On those particular facts, we held a single instance of swerving onto the shoulder did not constitute a traffic violation.  *Id.* at 978.  In *Ochoa* there was no evidence as to weather or road conditions, and the court found that "the troopers caused or contributed to causing the drift."  *Ochoa*, 4 F. Supp. 2d at 1011-12 & n. 4.  On those particular facts, the district court held that a single instance of swerving onto the shoulder was not a violation of section 8-1522.  *Id.* at 1012.  As *Ozbirn* makes clear, however, neither case stands for the proposition that a single instance of drifting onto the shoulder can *never* be a violation of a traffic statute like section 8-1522, which is what Cline, in effect, asks us to declare.  Rather, the particular facts and circumstances of each case determine the result.

349 F.3d at 1287.  The *Ross* court did note that in *Cline* the officer had

seen the defendant's vehicle cross the fog line and nearly strike a bridge

rail and the officer had opined this was a dangerous driving violation.  37

Kan. App. 2d at 130.  The fact that the pickup came dangerously close to

striking a bridge rail was discussed in *Cline*, not to satisfy any unsafe lane

change requirement recognized as part of § 1522(a), but to emphasize the

pickup's severe swerve was not likely caused by weather or road

conditions or by the trooper's presence behind the pickup.  349 F.3d at

1287.

The other Tenth Circuit decision cited in *Ross* is the *Gregory*

opinion from which the Kansas appellate panel quoted the following:

"The road was winding, the terrain mountainous and the weather

23

> condition was windy.  Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity.  The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane.  Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision.  These facts lead us to conclude that the single occurrence of moving to the right shoulder of the roadway which was observed by Officer Barney could not constitute a violation of Utah law and therefore does not warrant the invasions of Fourth Amendment protection."

*Ross*, 37 Kan. App. 2d at 131 (quoting *Gregory*, 79 F.3d at 978).  Other than observing that the Utah statute was identical to the Kansas statute, the *Ross* court does not apply the holding in *Gregory* or explain its significance to the proper interpretation of K.S.A. 8-1522(a).  The *Ross* opinion does mention that the officer in *Gregory* had testified the defendant's driving was indicative of an impaired state and this was one of the reasons for the traffic stop.  37 Kan. App. 2d at 130.

The *Ross* decision does not openly state whether the panel believed its construction and application of K.S.A. 8-1522(a) was consistent with Tenth Circuit precedent.  This court's impression is that should *Ross* be read as requiring proof of a lane change made "when it was not safe to do so,"  then it would conflict with Tenth Circuit's well-established line of case law applying § 1522(a) or the statutory counterpart found in other

states.

When defendants have argued their stops were similar to
*Gregory* in that they only drifted into another lane or onto the shoulder, the
Tenth Circuit has reiterated that *Gregory* and related precedent did not
establish a bright-line rule regarding what conduct constitutes a violation of
K.S.A. § 8-1522 or the nearly identical statutes in Colorado, New Mexico
and Utah, but rather highlighted the need to analyze objectively all the
surrounding facts and circumstances to determine whether there was an
adequate justification for the traffic stop.  *See, e.g., United States v.
Valenzuela*, — F.3d —, 2007 WL 2007553, at *2-3 (10th Cir. Jul. 12, 2007)
(Colorado statute); *United States v. Alvarado*, 430 F.3d 1305, 1308-09
(10th Cir. 2005) (Utah law); *United States v. Zabalza*, 346 F.3d 1255, 1258
(10th Cir. 2003) (Kansas law);  *United States v. Ozbirn*, 189 F.3d at 1198
(Kansas law); *United States v. Herrell*, 41 Fed. Appx. 224, 2002WL 725433
at *6 (10th Cir. 2002) (New Mexico law).

As best illustrated by the two most recent decisions cited
above, the Tenth Circuit's review of the reasonable suspicion finding has
focused on whether the vehicle was operated as nearly as practicable in a
single lane with the result turning on whether there were road, weather or

traffic conditions that made it impractical for the defendant to prevent his car from drifting out of its lane of travel.   *United States v. Valenzuela*, 2007 WL 2007553 at *2-*3 ("In this case, nothing in the record suggests any outside factors contributed to Defendant's lane drift" which was a single drift from the left westbound lane into right westbound lane for several seconds and then return to the left lane.); *United States v. Alvarado*, 430 F.3d at 1309 ("[T]here were no adverse weather or road conditions that might have made it impractical for Alvarado to prevent his vehicle from drifting out of the righthand lane and over the fog line" by about a foot for several seconds before crossing back.)  The Tenth Circuit in *Alvarado* expressly rejected the defendant's argument that an officer must have more than a single act of drifting across the fog line for there to be reasonable suspicion:

> Alvarado has failed to point to any objective factor that might have made it impractical for him to remain in a single lane.  Rather, his argument rests solely on the proposition that "[a] reasonable driver operating a motor vehicle at or near interstate speed limits has a difficult task of operating the vehicle entirely within a single lane for the entirety of this trip" and that "[v]ehicles traveling at interstate speeds, even with optimal road and weather conditions, do not typically stay in the exact center of the lane."  *Id.* at 11.  Essentially, Alvarado asks us to hold that an officer must observe something more than a single lane crossing in order to reasonably suspect a violation of Utah Code Ann. § 41-6-61(1) has occurred because any driver on the highway might inadvertently cross out of his lane once,

26

> regardless of the conditions that are present.  However, as explained
> above, we have already rejected the argument that the "as nearly as
> practical" qualification in § 41-6-61(1) requires the conclusion, as a
> matter of law, that a single instance of crossing over the fog line can
> never violate the statute.  Rather, as previously discussed, we
> understand it to require a fact-specific inquiry into the particular
> circumstances present during the incident in question in order to
> determine whether the driver could reasonably be expected to
> maintain a straight course at that time in that vehicle on that roadway.

430 F.3d at 1309.  Thus, as the statutes like K.S.A. § 8-1522 have been

interpreted and applied by the Tenth Circuit, drifting out of a lane just once

would provide reasonable suspicion when under the circumstances "the

driver could reasonably be expected to maintain a straight course at that

time in that vehicle on that roadway."  *Id.*

        Prior to *Ross*, the Tenth Circuit turned away a defendant's

argument that reasonable suspicion of a § 8-1522 violation required

evidence that the lane movement was unsafe or endangered defendant:

> With respect to Meyer's argument that there is an "unsafe movement"
> element in § 8-1522, he provides no support for that argument.
> Further, our decisions in *Ozbirn* and *Gregory* state that the statutory
> phrase "as nearly as practicable" precludes "absolute standards," but
> rather requires the kind of "fact-specific inquiry" we have conducted
> in this case.  *Ozbirn*, 189 F.3d at 1198.

*United States v. Meyer*, 20 Fed.  Appx. 808, 814, 2001 WL 1219394, **4

(10th Cir. 2001).  Even after *Ross*, the Tenth Circuit has preserved its fact-

specific inquiry:

27

> [A]s the Kansas Court of Appeals recently noted, "in articulating
> reasonable suspicion that a [violation of K.S.A. § 8-1522(a)] has
> occurred in order to justify the traffic stop, the totality of the
> circumstances must make it appear to the officer that not only did the
> defendant's vehicle move from its lane of travel, but it left its lane
> when it was not safe to do so."  *State v. Ross*, 37 Kan. App. 2d 126,
> 149 P.3d 876, 879 (Kan. Ct. App. 2007) (emphasis added).
>
> Mr. Brown does not dispute that Deputy Dollison saw his
> vehicle move from its lane and onto the shoulder of the road three or
> more times. Instead, he relies on Ross and the plain language of the
> statute, see K.S.A. § 8-1522(a) ("and shall not be moved from such
> lane until the driver has first ascertained that such movement can be
> made with safety "), and argues that the officers could not have
> reasonably suspected that he made an unsafe lane change.
>
> We disagree.  An officer's observation of a vehicle straying out
> of its lane multiple times over a short distance creates reasonable
> suspicion that the driver violated K.S.A. § 8-1522(a) so long as the
> strays could not be explained by "adverse physical conditions" such
> as the state of the road, the weather, or the conduct of law
> enforcement. *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir.
> 1999).  *See, e.g., United States v. Cline*, 349 F.3d 1276, 1287 (10th
> Cir. 2003); *United States v. Zabalza*, 346 F.3d 1255, 1258-59 (10th
> Cir. 2003).  Implicit in these decisions is the notion that when a
> vehicle repeatedly crosses out of its lane without apparent
> justification, an officer may reasonably suspect that the driver did not
> purposely move out of the lane and, thereby, failed to first ascertain
> that one or more of those departures could be "made with safety," in
> violation of K.S.A. § 8-1522(a).

*United States v. Brown*, 2007 WL 1241646 at *6 (10th Cir. Apr. 20, 2007).

The *Brown* decision fairly harmonizes *Ross* and the Tenth Circuit's well-

established precedent by recognizing reasonable suspicion of a § 8-

1522(a) violation if from the circumstances the officer could infer that the

driver did not purposely move out of the lane and, thereby, failed to first

ascertain the safety of the departure.  In sum, the Tenth Circuit in construing and applying this uniform vehicle code provision in Kansas and the neighboring states of Colorado, New Mexico and Utah has not used an unsafe movement element.

A review of other jurisdictions reveals more diversity in interpretation than one would expect for a uniform vehicle code provision. A number of jurisdictions read together the duties of maintaining a single lane and of ascertaining the safety of changing lanes before doing so and then recognize a violation only if the lane movement was made before the safety of the movement was ascertained.  *See, e.g., Crooks v. State*, 710 So. 2d 1041, 1043 (Fla.  App. 2 Dist. 1998); *State v. Tague*, 676 N.W.2d 197,203 (Iowa 2004); *Rowe v. State,* 363 Md. 424, 769 A.2d 879, 885 (2001) *State v. McBroom*, 179 Or. App. 120, 39 P.3d 226, 229 (Or. App. 2002); *Hernandez v. State*, 983 S.W.2d 867, 871 (Tex. App. 1998)[13].

---

[13]The court in *Hernandez* emphasized that the Texas statute was vague in requiring a vehicle to be operated with a single lane "as nearly as practical" and thereby inferred that the Texas legislature did not intend to create a separate offense.  983 S.W.2d at 871.  "This conclusion is bolstered by the use of the term 'practical' rather than "practicable."  The latter term has a somewhat more definite meaning:  'capable of being accomplished; feasible; possible,' while the former term is more ambiguous:  'manifested in practice; capable of being put to good use.'" 983 S.W.2d at 871 (citing Bryan A. Garner, *A Dictionary of Modern Legal Usage* 678 (2d ed. 1995).

Some of those decisions may be premised, in part, on reading the statute as prohibiting movement only between marked traffic lanes and not prohibiting movement across the fog line onto the shoulder of the road. *State v. Phillips*, 2006 WL 3477003 at *9 (Ohio App. 3 Dist. 2006); *see State v. Lafferty*, 291 Mont. 157, 162, 967 P.2d 363, 366 (Mont. 1998) ("In our view, however, the statute relates to moving from a marked traffic lane to another marked traffic lane."); *see, e.g., State v. Tague*, 676 N.W.2d at 203 (citing *Lafferty)*; *Rowe v. State*, 769 A.2d at 886 (citing and quoting *Lafferty*);  In some of those decisions, one can even find language suggesting that the statute is violated only by an unsafe lane change.  *See, e.g., Crooks v. State*, 710 So. 2d at 1043; *Rowe v. State,* 769 A.2d at 889. 879 (2001); *Hernandez v. State*, 983 S.W.2d at 871.

Other jurisdictions and courts read the uniform provision as consisting of two separate requirements and as having been violated if either requirement is not met.  *People v. Butler*, 81 Cal. App. 3d Supp. 6, 8, 146 Cal. Rptr. 856, 857 (1978); *People v. Smith*, 172 Ill. 2d 289, 665 N.E.2d 1215, 1218-1219 (1996) ("plain language of the statute establishes two separate requirements for lane usage"); *State v. Hodge*, 147 Ohio App. 3d 550, 771 N.E.2d 331, 338-39 (2002).  In *Butler*, the court observed that

30

to treat the two requirements as one "would mean that motorists were free

to ignore lane markings so long as they not make an unsafe movement.

Such an interpretation would have clearly deleterious effects on the

ordinary flow of traffic."  146 Cal. Rptr. at 857.  In *Hodge*, the court

elaborated on the duty to drive "as nearly as practicable" within a single

lane:

> {¶ 39} In deciding exactly what the legislature intended by the use of the word "practicable," we will use the ordinary definition and common sense.  In fact, if we were to insert the definition into the statute in place of the word "practicable," the statute would read:
> {¶ 40} "(A) A vehicle or trackless trolley shall be driven, as nearly as is *performable, feasible, possible,* entirely within a single lane . . ."
> {¶ 41} When read in this context, the statute without question mandates drivers to maintain their vehicle within a lane without some kind of exigent circumstance forcing the vehicle operator to do otherwise.
>    . . . .
> {¶ 43}  The legislature did not intend for a motorist to be punished when road debris or a parked vehicle makes it necessary to travel outside the lane.  Nor, we are quite certain, did the legislature intend this statute to punish motorists for traveling outside their lane to avoid striking a child or animal.  We are equally certain the legislature did not intend the statute to give motorists the *option* of staying within the lane at their choosing.  Common sense dictates that the statute is designed to keep travelers, both in vehicles and pedestrians safe.  The logical conclusion is that the legislature intended only special circumstances to be valid reasons to leave a lane, not mere inattentiveness or carelessness.  To believe that the statute was intended to allow the motorists the option of when they will or will not abide by the lane requirement is simply not reasonable.

771 N.E.2d at 337-38.

From its review of the case law interpreting and applying this uniform vehicle code provision, the court is unsure whether the Kansas Supreme Court would follow *Ross* in interpreting the two duties in § 8-1522(a) as just one, that is, moving from the lane of travel only after determining it was safe to move.  The court, however, is confident that the Kansas Supreme Court would not follow *Ross* insofar as the Kansas Court of Appeals may have interpreted § 8-1522(a) as to require for reasonable suspicion of any violation of this statute that the vehicle moved from the lane of travel when it was not safe to do so.  To recap the court's reasons discussed and analyzed above, such an interpretation would contradict the plain terms of § 1522(a), would change the offense from failing to ascertain the safety of an act to actually performing the unsafe act, would not promote the multi-state uniformity desired by the Kansas Legislature, would not further any policy interest or concern unique to Kansas, and would conflict with the well-reasoned precedent of other jurisdictions and, in particular, the well-established line of Tenth Circuit precedent interpreting § 1522(a) and the same uniform provisions in Utah, Colorado and New Mexico.

32

Application of *Ross* as Limited

For now, the court will accept the probability that the Kansas Supreme Court would follow *Ross* in interpreting § 1522(a) as not violated unless the driver changes lanes before the driver ascertains the safety of the lane change.[14]  The court finds that Trooper Nicholas possessed reasonable suspicion[15] the defendant Blanchard did not purposely move from her lane of travel onto the shoulder and, thereby, failed to first ascertain that her lane movement could be made safely.  There is no evidence that the defendant Blanchard used her turn signal before crossing over the fog line and driving onto the shoulder by a tire's width.  Instead of

———————————

[14]The court does so reservedly as this interpretation effectively nullifies the other express statutory duty of driving in a single lane, substantially impairs an important statutory purpose of promoting the integrity of lane markers, and essentially overturns years of federal court precedent interpreting K.S.A. § 1522(a) as having been violated when the vehicle was not "driven as nearly as practicable entirely within a single lane."  The *Ross* opinion is silent on these points.

[15]The court's role is not to decide whether the facts are sufficient to sustain a conviction under the K.S.A. § 8-1522(a) but whether they "are adequate to form an objectively reasonable suspicion that" the defendants' vehicle was being operated in violation of this statute.  *United States v. Vercher*, 358 F.3d 1257, 1260 (10th Cir. 2004).  This is "a context-specific inquiry to evaluate whether the historical facts, 'viewed from the standpoint of any objectively reasonable police officer,' *Ornelas* [*v.United States*], 517 U.S. [690] at 696 [1996], establish a minimal basis for reasonable suspicion."  *Id.* at 1262.

33

slowing down and stopping on the shoulder, the defendant's vehicle maintained its speed and returned to a proper lane of the roadway after a matter of seconds.[16]  There is no evidence that the defendant Blanchard departed from her lane onto the shoulder in response to an apparent hazard or adverse physical conditions or for some other equally valid or lawful reason.  One can reasonably infer from these circumstances that the defendant Blanchard never actually intended to move from her lane of traffic.  Thus, Trooper Nicholas had reasonable suspicion to believe that Blanchard moved out of her lane of travel without first ascertaining whether she could do so safely, all in violation of K.S.A. § 8-1522(a).[17]

_____

[16]The court did notice that as far as some of the details about the observed traffic violation, Trooper Nicholas' recollection was incomplete.  He could not recall specifically and only assumed from his general practice how long he had been following the car when he saw it swerve onto the shoulder.  Nor could he estimate with certainty as to how long the car traveled on the shoulder before returning to right lane.  In guessing that it would be twenty feet or more, the trooper testified the car was traveling seventy miles-per-hour.  Based on the short distance reflected in his guess, the Trooper Nicholas' testimony suggests that the car traveled on the shoulder only briefly and did not slow down or stop on the shoulder.  The court fairly understands the Trooper's testimony to suggest that he did not believe the defendant Blanchard had intentionally crossed over the fog line.

[17]The court does not consider the reasonableness and weight of this inference to be materially impacted by the fact that the defendant crossed over the fog line only once.  First, the application of K.S.A. § 8-1522(a) does not depend upon the number of lane movements but on the driver's failure to first ascertain the safety of making any lane movement.  Thus, if

A vehicle may be stopped when there is a reasonable suspicion that the driver may be falling asleep or is driving under the influence of alcohol or drugs.  *State v. Field*, 252 Kan. 657, 661-62, 847 P.2d 1280 (1993).  Though an extremely close call, Trooper Nicholas did have sufficient circumstances from which he could reasonably suspect the defendant Blanchard could be having difficulty staying awake at the wheel. There were no adverse conditions or other reasons to explain the sudden swerve onto the shoulder.  There were several circumstances to suggest that the vehicle was on an extended trip crossing several states.  Besides a Minnesota license plate, the car's exterior showed it had been driven recently in weather different from that currently being experienced in Kansas.  A reasonable officer rationally could infer the likelihood that the car had been driven all night from these circumstances in combination with the pre-dawn hour of travel.  An extended trip, the likelihood of overnight

_____

the circumstances reasonably sustain an inference that any one or more lane movements were unintentional, then reasonable suspicion may exist. Second, the Tenth Circuit in *Alvarado* put to rest the notion that "as nearly as practical" always excuses a single momentary drift onto the shoulder. "Rather, . . ., we understand it to require a fact-specific inquiry into the particular circumstances present during the incident in question in order to determine whether the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway."  430 F.3d at 1309.

travel, the pre-dawn hour, and the sudden swerve are enough, though just barely, for a reasonable suspicion[18] that the driver was having difficulty staying awake as to justify a stop for safety reasons.

### Consent Search of a Gift-Wrapped Package

The defendants contend that Trooper Nicholas, in opening a gift-wrapped package found in the trunk of the car, exceeded the defendants' general consent to search the car for "anything illegal."  The defendants argue that a gift-wrapped package is akin to a locked briefcase and that a reasonable person would not believe that in generally consenting to a search of the car that the defendants had also consented to the gift being unwrapped and searched.

The government argues that gift-wrapping a package is hardly the same as locking a container.  The government offers that the consent to search for anything illegal would include any container in which illegal items might be stored and that an officer may search the same in a manner

---

[18]"A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).  "Indeed, 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'"  *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) (quoting *Arvizu*, 534 U.S. at 274.

that is respectful of the containers and not destructive.  *United States v. Jackson*, 381 F.3d 984, 988-89 (10th Cir. 2004), *cert. denied*, 544 U.S. 963 (2005).  Finally, the government contends the defendants did not withdraw or limit their consent as shown by their failure to object to the package being unwrapped when the trooper asked them about its contents.

"The Fourth Amendment typically requires that law enforcement agents obtain a warrant prior to conducting a search.  A warrant is not required, however, when the defendant consents to the search."  *Id.* at 988 (internal citations omitted).  "When law enforcement officers rely upon consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search."  *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003).  In measuring the scope of the consent, the court need not consider "whether the suspect would have wanted an officer to search a container that contained contraband.  If such were the test, [courts] would be obliged to suppress the evidence in . . . every . . . case involving a defendant who did not wish to be caught transporting narcotics."  *Marquez*, 337 F.3d at 1208.  Therefore, "the proper inquiry is whether it would be objectively reasonable for a law enforcement officer to conclude that a suspect's general consent to search extends to a

particular container in a car." *Id.; United States v. Brooks*, 427 F.3d 1246, 1249 (10th Cir. 2005), *cert. denied*, 546 U.S. 1222 (2006).

The Supreme Court and the Tenth Circuit have held that general consent to search a particular area is reasonably understood to extend to a search of any container within that area which could contain the items being searched for unless the suspect indicates that he wishes to terminate or limit the search. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Osage,* 235 F.3d 518, 521 (10th Cir. 2000).  "A defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication that the search was within the scope of consent." *Jackson*, 381 F.3d at 988; *see United States v. Walker*, 104 F.3d 368, 1996 WL 731631 (10th Cir. 1996) (unpub.) (holding that the search of gift-wrapped packages in the back of a minivan was within the scope of the defendant's general consent to search the van because the defendants did not object or place any limitations on the search), *cert. denied*, 520 U.S. 1191 (1997).

The defendants do not dispute that general consent to search a vehicle typically extends to containers within the vehicle which could

38

reasonably contain the items being searched for.  Rather, the defendants

suggest that when a container which could otherwise be opened during a

consensual search of a vehicle is gift-wrapped, it is unreasonable for an

officer to unwrap one end of the package without destroying the paper and

examine the contents of the container.  Therefore, the defendants consider

that any opening of a gift-wrapped package is as intrusive and destructive

as the breaking open of a locked briefcase, and therefore unreasonable.

The defendants' analogy to a locked briefcase is borrowed from

the 1991 Supreme Court decision in *Florida v. Jimeno*.  In *Jimeno*, the

Court concluded:

> [I]t was objectively reasonable for the police to conclude that
> the general consent to search respondent's car included
> consent to search containers within that car which might bear
> drugs.  A reasonable person may be expected to know that
> narcotics are generally carried in some form of a container.
> "Contraband goods rarely are strewn across the trunk or floor of
> a car."  The authorization to search in this case, therefore,
> extended beyond the surfaces of the car's interior to the paper
> bag lying on the car's floor.

*Jimeno*, 500 U.S. at 251.  The Supreme Court also distinguished its holding

from the Florida Supreme Court's holding in *State v. Wells*, 539 So.2d 464

(1989), *aff'd on other grounds*, 495 U.S. 1 (1990), stating:

> There the Supreme Court of Florida held that consent to search
> the trunk of a car did not include authorization to pry open a

locked briefcase found inside the trunk.  It is very likely
unreasonable to think that a suspect, by consenting to the
search of his trunk, has agreed to the breaking open of a
locked briefcase within the trunk, but it is otherwise with respect
to a closed paper bag.

*Id.* at 251-52.  The Supreme Court rejected imposing an additional

requirement of requesting separate consent to search closed containers,

so long as a general consent "would be reasonably understood to extend to

a particular container."  *Id.* at 252.

In *United States v. Osage*, the Tenth Circuit observed that a

distinction between breaking open a locked briefcase and opening a closed

paper bag is the destructive nature of breaking open a locked briefcase,

which renders the container "useless and incapable of performing its

designated function."  *See Osage*, 235 F.3d at 520-21 ("opening of a

sealed can, thereby rendering it useless and incapable of performing its

designated function, is more like breaking open a locked briefcase than

opening the folds of a paper bag").  Drawing on this distinction, the court

held that "before an officer may actually destroy or render completely

useless a container which would otherwise be within the scope of a

permissive search, the officer must obtain explicit authorization, or have

some other lawful basis upon which to proceed."  *Osage*, 235 F.3d at 522.

In subsequent decisions, the Tenth Circuit has relied on *Osage* to determine whether officers exceeded the scope of consent when they opened containers during a consensual search.  *See Jackson*, 381 F.3d at 988-89; *Marquez*, 337 F.3d at 1209.  In *Jackson*, the Tenth Circuit held that opening a sealed bottle of baby powder with a Leatherman blade did not exceed the scope of the general consent given by the defendant.  *Jackson*, 381 F.3d at 988-89.  Similarly, in *Marquez*, the court ruled that it was reasonable for an officer to pry open the nailed-down covering of a storage compartment during a consent search.  *Marquez*, 337 F.3d at 1209.  In both cases, the court determined that it was reasonable for the officers to open and search a container during a general consent search because any damage that the officers may have caused to the containers as a result of the searches was "*de minimis*" in nature and "well short of the complete and utter destruction or incapacitation" required by *Osage*.  *Jackson,* 381 F.3d at 989; *Marquez*, 337 F.3d at 1209; *see United States v. Felix*, 12 Fed.Appx. 827, 2001 WL629622 (10th Cir. 2001) (unpub.) (holding that the scope of consent was not exceeded when officers unscrewed a gasoline tank from its moorings to search it because it did not destroy the container or render it useless).

41

Pursuant to the defendants' consent, Trooper Nicholas was permitted to search the defendants' vehicle and any container within the vehicle that could reasonably contain "anything illegal."  The package wrapped in silver paper was such a container.[19]  The defendants were aware that Trooper Nicholas was searching the trunk of the vehicle and that he was interested in the contents of the gift-wrapped package, as they were asked repeatedly about its contents.  The defendants had ample opportunity to instruct Trooper Nicholas not to search the trunk or the package.  However, the defendants never objected to Trooper Nicholas's search of the package or placed any limitation on the scope of the consent.  Therefore, it was reasonable for Trooper Nicholas to believe that the defendants' consent extended to the gift-wrapped package found in the trunk.

In determining whether Trooper Nicholas exceeded the scope of the consent when he carefully opened the gift-wrapped package, the

---

[19]The defendants rely on *Shelton v. State*, 549 So.2d 236 (Fl. Ct. App. 1989), *rev. dismissed*, 557 So.2d 867 (Fla. 1990), to support their proposition that additional consent must be obtained prior to unwrapping a gift-wrapped container during a general consent search.  However, *Shelton* was decided two years prior to the Supreme Court's decision in *Jimeno* which rejected the presumption that general consent to search an area does not extend to containers within the area that may reasonably contain the subject of the search.  *Jimeno*, 500 U.S. at 250.

42

inquiry does not turn on whether a gift-wrapped package more closely resembles a locked brief case than a paper bag.[20]  Rather, the full inquiry extends to whether the manner in which Officer Nicholas handled the gift-wrapped package is more like breaking open a locked brief case than opening the folds of a closed paper bag.  This full inquiry employs the Tenth Circuit test of whether the container was destroyed or rendered useless as a result of the search.

Trooper Nicholas's attention was first drawn to the gift-wrapped package when he noticed that it was not wrapped carefully and that wider packaging tape had been used.  Such wrapping did not fit the Trooper's impression of commercially-wrapped packages created by the defendants' story.  He carefully opened the wrapping paper on one end of the package

---

[20]  The defendants cite to *United States v. Hephner*, 260 F. Supp. 2d 763 (N.D. Iowa 2003), *judgment aff'd*, 103 Fed. Appx. 41 (8th Cir. 2004), to argue that general consent to search a vehicle does not extend to sealed containers within the vehicle.  The holding in *Hephner* does not submit to such a broad reading.  Rather, the court in *Hephner* concluded that the scope of one defendant's (Kramarczyk's) general consent to search his vehicle did not extend to a locked toolbox in that vehicle, which the officers knew belonged exclusively to another defendant (Hephner).  The court's holding did not turn on whether the locked toolbox was more comparable to a locked briefcase than a paper bag, but on whether it was reasonable for the officers to believe that Kramarczyk had actual or apparent authority to consent to the opening of the locked toolbox, which did not belong to him. *Hephner*, 260 F. Supp. 2d at 773.

43

without tearing it and discovered that the box covered by the wrapping paper was originally for a stereo speaker, which is not merchandise typically found in a souvenir shop.  From his partial examination of the package, Trooper Nicholas doubted the defendants' story that it contained a 3-D puzzle of Las Vegas and a pair of shoes.  Requesting Trooper Leatherman's assistance, he carefully slid his hand into the box, making certain not to break the box or tear the wrapping paper. Inside the package, Trooper Nicholas felt tightly-wrapped bundles of a hard substance that he recognized as similar to bundles of illegal narcotics.   At this point, any damage that Trooper Nicholas caused to the package or to the wrapping paper was *de minimis* in nature and well short of the complete destruction required by *Osage*.

Trooper Nicholas' actions in carefully opening the gift-wrapped package were not like breaking open a locked briefcase, thus rendering it completely useless.  Because the defendants did not limit the scope of their consent or object to the search of the package, it was reasonable for Trooper Nicholas to believe that the general consent to search the vehicle for anything illegal extended to the gift-wrapped package in the trunk of the car.  Because the package was not destroyed or rendered completely

44

useless as a result of Trooper Nicholas' search, the search of the package was reasonable and within the scope of the general consent to search the car.

IT IS THEREFORE ORDERED that the defendant Crystal Blanchard's pretrial motion to suppress evidence seized from a car she was driving on January 5, 2007, (Dk. 27) is denied;

IT IS FURTHER ORDERED that the defendant Robert Jones's motion to join in the motion to suppress (Dk. 28) is granted.

Dated this 7th day of August, 2007, Topeka, Kansas.


s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge